UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NEW HAVEN

_____

| | |
|---|---|
| CURTIS JAMES JACKSON, III  <br><br>Plaintiff,<br><br>v.<br><br>WILLIAM LEONARD ROBERTS, II<br><br>Defendant | Case No:  3:17-cv-00550-WWE<br><br><br>*transferred from*<br><br>Bankruptcy<br>Adversary Proceeding: 15-02066 |

_____

**AFFIDAVIT OF BOB KOHN IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

I, Robert H. Kohn, am over the age of 18 and hereby state the following representations truthfully and accurately to the best of my ability:

1.     On January 31, 2018, I was disclosed as an expert in this case on behalf of the Defendant William Leonard Roberts, II ("Roberts") pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. In support of my Rule 26 expert disclosure, I submitted a 75-page expert report, which I understand was filed under seal in support of Defendant Roberts' Opposition To Plaintiff's Motion For Partial Summary Judgment.  [Doc. 68; see also Doc. 68-4, Expert Report of Bob Kohn ("Report")]. In that Report, I reserved the right to supplement or modify the Report and the opinions expressed in it, based upon additional facts, documents, or other

materials that may be brought to my attention.

2. I have since been asked to comment on the following statement contained on pages 4-5 of Plaintiff's Reply Brief (Doc 75) (quoting Plaintiff's Statement of Material Fact 36, Doc 69), filed after I submitted the Report. ███

███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

3. That interpretation is not supported by the terms of Mr. Jackson's recording agreement.

4. I have reviewed the recording agreement between Mr. Jackson and Shady/Aftermath Records dated June 14, 2002. ████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████

███████████████████████████

████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

5.      As Mr. Jackson testified in his deposition, he recorded the vocal track of the *In Da Club* recording while he was subject to his recording agreement with Shady/Aftermath, and that the vocal track was combined with a pre-existing instrumental track to become the *In Da Club* recording on his commercially released album entitled *Get Rich Or Die Tryin*. Being a work for hire, Mr. Jackson's vocal performance on the *In Da Club* recording has been owned—from the time it was first fixed to this day—by Shady/Aftermath, not Mr. Jackson.

6.      Contrary to his assertion, Mr. Jackson did not retain under his recording agreement approval rights for "*any commercial use or any remix* of his recordings." [Plaintiff's Reply Brief at 4-5 (Doc 75)]. There, in support of that broad assertion, Mr. Jackson cites Plaintiff's Statement of Undisputed Facts 36, Dkt. No. 69 at ¶ 36, ████████████████████████████████████████ ███████

7.      ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████

8.  That is, Mr. Jackson *does not* have the right to approve the use of his Master Recordings, including his *In Da Club* vocal track, ███████████████

███████████████████████████████████

███████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████

9.  Because record companies like Shady/Aftermath are in the business of producing records from a variety of recording artists, they often run cross-promotions involving multiple artists. They must, therefore, reserve the right to use, and authorize the use of, an artist's Master Recordings in connection with a *commercial* or other form of promotion of Records, including those for other recording artists.

10.  T███████████████████████████

███████████████████████████████████

███████████████████████████████████

did not restrict the right to use his Master Recordings ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

11. Defendant's *In Da Club* mix-tape is a ▮▮▮▮▮▮ Per the plain language of Mr. Jackson's recording agreement, Shady/Aftermath had every right, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ to authorize Defendant Roberts' use of the *In Da Club* vocal track excerpt, which Shady/Aftermath owns, without Mr. Jackson's consent.

12. Based on the facts and circumstances presented to me, a court could find that Shady/Aftermath had indeed given Defendant Roberts an implied, if not express license to use the *In Da Club* vocal excerpt in connection with Defendant Roberts's mix tape. Not only did Shady/Aftermath affirmatively supply a recording for Defendant's use in his mix tape (for the same recordingwhich contains the vocal excerpt), it has never objected to the use of the *In Da Club* excerpt in the mix tape at any time for any reason.

13. Again, Mr. Jackson's recording agreement specifically grants Shady/Aftermath the right to use, or authorize others to use, ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for Records. LiCalsi Dec., ▮▮▮▮▮▮▮▮▮▮ Thus, *even if* Mr. Jackson considers Defendant Robert's mix tape to be a ▮▮▮▮▮ Mr. Jackson has no contractual right to prevent Shady/Aftermath from granting Defendant Roberts' permission to use the *In Da Club* vocal track.

14. Second, the other contractual provision upon which Mr. Jackson relies—███████—does not give Mr. Jackson the right of approval of ███████████.

15. ███████████ concerns the post-production process necessary to produce a technically satisfactory recording suitable for commercial reproduction and distribution. In that section, what Shady/Aftermath agreed not to do was █ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████.

16. ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

LiCalsi Dec., Ex 6 at Section 8.03(g).

17. In a nutshell, when an artist delivers to his record company a set of tracks comprised of raw studio recordings, the tracks must go through a process called *audio mixing*, a post-production process in which multiple raw audio tracks are blended together. The work is typically performed by an audio engineer, together with the record producer and sometimes the recording artist. The work is usually done using a *mixing console,* which allows the creators to configure what

portion of each track is used, at what time, at what amplification, and with what sound effects or audio dubbing to be added, using a variety of inputs. The result of the mixing process is called a *final mix*. The final mix then goes through another post-production process called *mastering*, which involves transferring the final mix into *data* that is stored in a form that may be used for reproduction and distribution. Sometimes, often upon the advent of new technologies used for mastering or for delivering phonorecords to the public (e.g., new forms of digital delivery), a Master Recording will need to be edited, remixed or remastered for it to be commercially satisfactory. When that's the case, the record company will charge the costs of doing so to the artist as a ▬▬▬▬▬▬.

    18.    In typical artist recording agreements, such as Mr. Jackson's, all of the costs of *recording*, *mixing*, and *mastering,* and *remixing* and *remastering,* are ultimately born by the recording artist. Indeed, the definition of the term ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬]

19. Thus, Plaintiff misunderstands the importance of ███████, which gives the artist the opportunity to do the ████████ work or have a third party do it, presumably at a rate less than what the record company would charge, provided the artist will do the work in 10 days. Thus, ████████ ████████ refer to work of editing and remixing performed in preparing the recordings for distribution. ████████ has nothing to do with subsequent uses of the Master Recording in other recordings, ████████ ████████ ████████ Otherwise, ████████ would be inconsistent. Mr. Jackson's interpretation is, respectfully, plain wrong.

20. Moreover, it is noteworthy that Plaintiff does not contend that he has a contractual approval right over the use of his *name or likeness* in connection with Records. Of course, he did not reserve that right. On the contrary, Plaintiff specifically granted that right to Shady/Aftermath. ████████

████████
████████
████████
████████
████████
████████
████████



21. Again, record companies like Shady/Aftermath often run cross-promotions involving multiple recording artists. They must, therefore, reserve the right to use not only the artist's Master Recordings, but also the artist's name or likeness, in connection with commercials or promotions of Records of other recording artists. This is why the emphasized language in Section 8.01(a) above uses the broadly-defined word ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ rather than the more narrow ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ LiCalsi Dec., ▬▬▬▬▬▬▬

22. Accordingly, Shady/Aftermath, Mr. Jackson's record company, has every right to license the use of Mr. Jackson's name and likeness in connection with the marketing and exploitation of his Phonograph Records and any *promotional merchandise* (i.e., merchandise *not intended for resale to consumers*), such as Defendant's mix tape (which was not intended for resale to consumers), without compensation to Mr. Jackson.

23.     In sum, Mr. Jackson's recording agreement says the opposite of what he contends. Shady/Aftermath has the contractual right to permit the use of the *In Da Club* vocal track except, together with Mr. Jackson's name or likeness, for use in Defendant Robert's mix tape. Based on the facts and circumstances presented to me, a court could find that Shady/Aftermath had indeed given Defendant Roberts an implied, if not express license to use the *In Da Club* excerpt, *as well as Mr. Jackson's name*, in connection with the mix tape Records recorded by Defendant Roberts and distributed in a way *not intended for resale*.

24.     Of course, if Mr. Jackson believes his consent was required, then his remedy would arise from a breach of contract by Shady/Aftermath, not by any action by Defendant Roberts.

25.     Further, it is undisputed that Mr. Jackson does not own the *In Da Club* vocal track (or pre-existing instrumental track). Should defendant Roberts have required a license to use an excerpt of the vocal track, the license would be issued by its owner, Shady/Aftermath, not the Mr. Jackson. That is the custom and practice of the music industry, which Mr. Jackson specifically acknowledged. ███████████████████ The industry practice has its basis in the Copyright Act's *preemption* of any common law action to enforce a copyright owner's exclusive rights in a sound recording. That is, where a voice is fixed in a

phonorecord of copyrighted sound recording, there can be no state law claim for unauthorized use of the recording.

26.  It has become customary in the music industry for rap artists to produce and distribute "mix-tapes," comprising one or more musical sound recordings, typically produced and released by a recording artist independently from his or her record company, and customarily issued free of charge. These self-produced and self-released mixed-tapes are distinguished from "commercial albums," which are financed, prepared, and released into normal record retail channels by the artist's record company. Typically, a mix-tape will feature a "mix" of different tracks, such as an existing underlying track containing instrumentals or "beat" track, created and owned by a third party over which the rap artist will lay or "spit" his new vocals over the beat. Or, the artist may "mix" in a new track or tracks, containing the artist's new vocals or beats, and/or vocals or beats from other existing recordings.

27.  When rap artists who use pre-existing copyrighted works in a mix-tape receive a claim for copyright infringement for the use of such works, it is typically from the owner of a digital sample or other minor material used in the production, not the lead performing artist featured in the pre-existing work or the record company who owns such work. Should defendant Roberts have required a license to use the short vocal track embodying plaintiff Jackson's voice, the license

would properly be granted by plaintiff Jackson's record company, Aftermath/Shady, not plaintiff Jackson.

28. When an artist uses an excerpt of a sound recording as part of another sound recording under license from the copyright owner, no separate licenses (e.g., for "right of publicity," trademark, service mark, or otherwise), beyond any necessary copyright licenses, are required, by law or custom, for the use of a performer's voice on a copyrighted sound recording. This is because the voice of the performer (as well as any sounds produced by other vocalists, musicians, or equipment used by sound engineers and producers) becomes an integral part of the series of sounds that make up the sound recording. 17 U.S.C. §101 (definition of "sound recording"). A sound recording is a subject matter of federal copyright law (Id. at §102, §106) which preempts any common law action to enforce rights within its owner's exclusive rights under the copyright. Id. at §310(a).

29. Should courts allow state "right of publicity" actions for using excerpts of copyrighted sound recordings, a flood of litigation would chill the creation of such recordings, even where the use is expressive or transformative.

30. Moreover, whether one is authorized or not to use an excerpt of a sound recording as part of another sound recording (whether through an express or implied license to do so, or by law, such as when the use is incidental, is part of expressive speech protected by the First Amendment, or is transformative under

the Doctrine of Fair Use), it is music industry practice to credit the source of the excerpted recording, including the name or identity of the performers featured in it.

31.     To this end, the customary credit accorded to Mr. Jackson on the album cover for use of the short excerpt on Defendant Robert's mix-tape is the kind of fleeting and incidental use of a person's name, voice or likeness for advertising or trade purposes that are not actionable under the "right of publicity."

32.     In addition, during the course of what has been described in the press as a "beef" or "feud" between plaintiff Jackson and defendant Roberts, it is clear, in my opinion, that each have used the other's name, voice, and likeness in copyrighted works not for the purposes of trade or advertising, but for purposes of non-commercial *expression* of art; and opinionated cultural commentary or criticism regarding the recordings, talent, lifestyle, or newsworthy events regarding the rivalry between the parties.

33.     In the *In Da Club* recording at issue in this case, defendant Roberts uses a short excerpt of ten lines of a vocal track that Mr. Jackson does not own and appends it at the tail end of the track. The voice of nonparty Dr. Dre can be heard at the beginning or "intro" and thereafter Defendant Roberts' lyrics or performance begins. Defendant's recording comprised an artistic expression of music with cultural commentary as a whole in its own right, and thus, constitutes the kind of expression that falls within the zone of First Amendment protection.  The excerpt

of Mr. Jackson's voice recording (again, owned by Shady/Aftermath) inserted at the "outro" of Defendant's recording was merely incidental, and separately permitted under the *de minimus* doctrine of the First Amendment.

34.  Finally, as to damages for the infringement of the right of publicity, based on my over 35 years of experience involving authorized and unauthorized uses in music and entertainment licensing, it is my view that Plaintiff's expert witness employed an incomplete methodology that resulted in a speculative evaluation. Before going on to evaluate the market value of a purported non-permitted use, one must first assess the extent to which permission was required at all. Plaintiff's expert made no attempt to do this.

35.  Because there was no use of plaintiff Jackson's name, voice or "identity" that is actionable under his right of publicity, the value of the use of plaintiff Jackson's voice in the recording and name on the album cover is zero. Because the use was *expressive*, the commercial licensing examples that plaintiff's expert uses for comparison are inapt. Any commercial aspects of the expressive use of plaintiff Jackson's name and voice were incidental to that use.

I declare under penalty of perjury that the foregoing affidavit is true and correct and was executed this 7th day of May, 2018 in New York, NY.

_____
Bob Kohn

Subscribed and sworn this
7 day of May, 2018.

_____
Notary Public

MICHAEL SLATTERY
Notary Public - State of New York
NO. 01SL6277937
Qualified in Queens County
My Commission Expires 3/8/21