19-0480-bk
*Jackson v. Roberts*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2019

(Argued: January 23, 2020        Decided: August 19, 2020)

Docket No. 19-480

─────────────────────────────

In re: Curtis James Jackson, III,

*Debtor*.

─────────────────────────────

Curtis James Jackson, III,

*Plaintiff-Appellant*,

v.

William Leonard Roberts, II,

*Defendant-Appellee*.

─────────────────────────────

Before:

     PIERRE N. LEVAL, REENA RAGGI, DEBRA ANN LIVINGSTON, *Circuit Judges*.

     Plaintiff Curtis James Jackson III appeals from the judgment of the United States District Court for the District of Connecticut (Warren W. Eginton, *J.*) granting summary judgment to Defendant William Leonard Roberts II on Jackson's claim of violation of Connecticut common law right of publicity, on the grounds that the claim is preempted by the Copyright Act. AFFIRMED.

FREDERICK A. BRAUNSTEIN, Robins
Kaplan LLP, New York, NY (Paul V.
LiCalsi, Robins Kaplan LLP, New York,
NY and Glenn A. Danas, Robins Kaplan
LLP, Los Angeles, CA, *on the brief*) *for
Plaintiff-Appellant*.

JONATHAN D. GOINS, Lewis Brisbois
Bisgaard & Smith LLP, Atlanta, GA
(Leron E. Rogers and John T. Rose,
Lewis Brisbois Bisgaard & Smith LLP,
Atlanta, GA, and Nicholas P. Hurzeler,
Lewis Brisbois Bisgaard & Smith LLP,
New York, NY, *on the brief*), *for
Defendant-Appellee*.

LEVAL, Circuit Judge:

Plaintiff Curtis James Jackson III appeals from the judgment of the

District Court for the District of Connecticut (Warren W. Eginton, *J.*) granting

summary judgment in favor of Defendant William Leonard Roberts II on the

grounds that Jackson's claim of violation of the Connecticut common law

right of publicity is preempted by the Copyright Act. Jackson and Roberts are

both recognized hip-hop recording artists, known to the public by their stage

names: Jackson is known as "50 Cent" and Roberts is known as "Rick Ross."

This dispute arises from Roberts's use of a sample taken from one of Jackson's

best-known songs, "In Da Club," in a mixtape entitled *Renzel Remixes*, which

Roberts released for free in 2015, in advance of Roberts's then-upcoming

commercial album, *Black Market*. Jackson's complaint alleged that, on the

mixtape, Roberts's use of Jackson's voice performing "In Da Club," as well as

of Jackson's stage name in the track title identifying that song, violated

Jackson's right of publicity under Connecticut common law. The district court

granted Roberts's motion for summary judgment. Because we conclude that

Jackson's claim is preempted under either the doctrine of implied preemption

or under the express terms of § 301 of the Copyright Act, we AFFIRM the

grant of summary judgment.

## A.  BACKGROUND

In 2003, Jackson released his debut rap album, *Get Rich or Die Tryin'*,

which includes the song "In Da Club." *Billboard* named "In Da Club" as one of

the "Hot 100 Songs of the Decade." The song helped to propel Jackson to

international fame. Jackson recorded "In Da Club" pursuant to an agreement

(the "Recording Agreement") with his then record label, Shady

Records/Aftermath Records ("Shady/Aftermath"). By operation of the

Recording Agreement, Jackson owns no copyright interest in "In Da Club."[1]

Moreover, Jackson granted to Shady/Aftermath the "perpetual and exclusive

rights during the term of [the Recording Agreement]," and a non-exclusive

right thereafter, to use Jackson's name and likeness "for the purposes of trade,

or for advertising purposes . . . in connection with the marketing and

exploitation of Phonograph Records and Covered Videos hereunder." App'x

at 52. Shady/Aftermath, however, agreed to refrain from licensing the

recordings made pursuant to the Recording Agreement "for use in a

commercial in the United States [with certain exceptions]" or "for use as a

'sample'" without Jackson's consent. *Id.* at 54. Those restrictions "apply

[during and] after the term of [the Recording] Agreement," subject to certain

other conditions. While the term of the Recording Agreement is not clear,

Jackson contends (and Roberts does not dispute) that it terminated in 2014. *Id*.

In November 2015, Roberts released the mixtape *Renzel Remixes* for free

over the internet. In the hip-hop world, a "mixtape" — unlike a commercial

---

[1] In Section 7.01 of the Recording Agreement, Jackson acknowledged that all recordings and performances made pursuant to the Recording Agreement were works made for hire and are the sole property of Shady/Aftermath.

4

album — is an album of material generally produced by a recording artist for free distribution to fans. As both Jackson and Roberts agree, it is common for hip-hop mixtapes to include "remixes," often consisting of new vocal recordings by the releasing artist, combined with samples of songs by other artists who are identified by name. And as both Jackson and Roberts agree, many hip-hop artists (including Jackson himself) have created mixtapes that included samples of recordings of other artists *without* obtaining permission from either the recording artist or the copyright holder of the work sampled. Some (but not all) mixtapes are released for free in advance of an upcoming commercial album by the same artist and include material that promotes the upcoming release.

Roberts's *Renzel Remixes* mixtape is a compilation of 26 remixes in which Roberts performs his own new lyrics over audio samples of popular songs by well-known recording artists. For 11 remixes, the track list identifies 18 original recording artists associated with the samples, including, for example, "Hello (Feat. Adele)," "Bill Gates (Feat. Lil Wayne)," and "In Da

Club (Ft. 50 Cent)."[2] The "In Da Club (Ft. 50 Cent)" track consists of Roberts rapping over the original instrumental track of Jackson's song, followed by a roughly thirty-second sample of Jackson singing his refrain from the original "In Da Club" recording, reproduced without alteration. Roberts did not obtain or request permission from Shady/Aftermath or from Jackson to include those in his mixtape, or to use Jackson's stage name.

Roberts included in the "In Da Club (Ft. 50 Cent)" remix several references to his then-upcoming commercial album, *Black Market*, repeating the lines "Only on the Black Market, December 4th / The Album is out." The cover art for Roberts's mixtape included a reference in small white typeface to *Black Market* and its release date, as shown below:

---

[2] "Ft." and "Feat." are abbreviations for "featuring." The mixtape also includes several remixes based on samples of songs by other artists who are *not* identified by name on the track list. *See* App'x at 137 (noting that *Renzel Remixes* includes a sample of The Weeknd's song "Can't Feel My Face"); *id.* at 138 (track list showing a remix titled "Can't Feel My Face" without a "Ft." designation).

6



Jackson brought this action against Roberts on December 23, 2015, alleging that Roberts's use of his voice (in the "In Da Club" sample) and his stage name (in the track title) violated his right of publicity under Connecticut common law.[3] Both parties moved for summary judgment on the issue of Roberts's liability. Roberts argued, *inter alia*, that his use was protected by the First Amendment, that Jackson's claim was preempted by the Copyright Act, and that Jackson had no publicity rights associated with "In Da Club," having

---

[3] Jackson commenced this suit as a part of a Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the District of Connecticut. *See* Complaint, *In re Curtis James Jackson, III*, No. 15-21233, ECF No. 288 (Bankr. D. Conn. Dec. 23, 2015). Following a joint motion of the parties, the action was transferred to the District Court for the District of Connecticut (Eginton, *J.*). Order Granting Motion to Withdraw Reference, *Jackson v. Roberts*, No. 3:17-cv-550, ECF No. 4 (D. Conn. Mar. 17, 2017).

transferred them to Shady/Aftermath in the Recording Agreement. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment, *Jackson v. Roberts*, No. 3:17-cv-550, ECF No. 100 (D. Conn. May 8, 2018).

The district court granted Roberts's motion for summary judgment, concluding, in an order of September 28, 2018, that, under the Recording Agreement, Jackson had "surrendered his rights to the use of his name, performance and likeness associated with the master recording of 'In Da Club' in connection with the advertising and marketing of 'Phonograph Records,'" and that his "right of publicity claim is preempted" because Jackson "cannot assert a tort action based on the rights that he has contractually surrendered." App'x at 604–05. Jackson timely appealed.

## B.  DISCUSSION

### i.    Recording Agreement

As a preliminary matter, we note that the district court erred in interpreting the relevant provisions of the Recording Agreement to reach the conclusion that Jackson "surrendered his rights to the use of his name, performance and likeness associated with the master recording of 'In Da

8

Club.'" App'x at 604. While the district court correctly noted that under Section 8.01 of the Recording Agreement, Jackson granted to Shady/Aftermath the "perpetual and exclusive" rights to utilize his name and likeness "for the purposes of trade, or for advertising purposes . . . in connection with the marketing and exploitation of Phonograph Records and Covered Videos hereunder," that grant was exclusive only "during the term of the Recording Agreement," which, the parties appear to agree, ended in 2014. Accordingly, upon expiration of the Recording Agreement, Jackson recovered a shared interest in his right of publicity and is not contractually precluded from bringing this right of publicity claim. We therefore disagree with the district court's dismissal of Jackson's claim to the extent it was based on the court's finding that "[Jackson] cannot assert a tort action based on the rights that he has contractually surrendered." App'x at 605.

ii.     <u>Copyright Act Preemption</u>

Jackson contends that the district court erred in concluding that his claim is preempted. Although relying on reasoning that differs in some regards from the district court's, we agree with the court's result and conclude that Jackson's claim is preempted under the doctrine of implied

9

preemption. We hold, in the alternative, that Jackson's claim as to the use of his voice on Roberts' mixtape is preempted by the express terms of § 301 of the Copyright Act ("statutory preemption"). Generally stated, implied preemption precludes the application of state laws to the extent that those laws interfere with or frustrate the functioning of the regime created by the Copyright Act.[4] Statutory preemption preempts state law claims to the extent that they assert rights equivalent to those protected by the Copyright Act, in works of authorship within the subject matter of federal copyright. *See* 17 U.S.C. § 301.

---

[4] In contrast to preemption of state laws by operation of a congressional statute providing for such preemption, "implied preemption" occurs by "direct operation of the Supremacy Clause." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012). Implied preemption renders a state law inoperative in two circumstances: (1) when the state law "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," (so called "*field* preemption") and (2) when the state law "actually conflicts with federal law," (so called "*conflict* preemption"). *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). The Supreme Court, however, has warned against assigning too much importance to these labels, noting that categories are not "rigidly distinct" and may overlap. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000). For that reason, we use the term "implied preemption" to refer to the non-statutory species of Copyright Act preemption.

### a. Implied Preemption

The doctrine of implied preemption will bar a state law claim where, "under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (alterations omitted); *see also Goldstein v. California*, 412 U.S. 546, 561 (1973) (addressing the scope of implied preemption by the Copyright Act).[5] What constitutes a "sufficient obstacle" is a "matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. If, by reason of state law, a federal statute's "operation within its chosen field . . . [would] be frustrated and its provisions be refused their natural effect[,] the state law

---

[5] Implied preemption under the Copyright Act typically applies when a state law would frustrate the operation of a provision of federal copyright law. *See, e.g.*, *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 268–70 (5th Cir. 1988) (holding that a state law permitting software producer to prohibit disassembly of its computer program conflicted with the policy reflected in 17 U.S.C. § 117(a), which expressly permits the owner of a copy of a software program to copy or adapt that program in order to utilize it).

must yield to the regulation of Congress." *Id.* (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).[6]

Of course, many doctrines of state law, including libel, fraud, right of privacy, and right of publicity, intended to protect substantial interests, can interfere substantially with the full exploitation of rights created by the Copyright Act. Those state law doctrines, in other words, can restrict (and in some cases prohibit) the publication and dissemination of works of authorship governed by the Act, and therefore at least arguably can stand as an obstacle to the Copyright Act's policy of "encourag[ing] the dissemination of existing and future works." *Golan v. Holder*, 565 U.S. 302, 326 (2012). Nonetheless, while the central justification and value supporting application of the conflict preemption aspect of implied preemption is the potential of state law claims to interfere with copyright, many such state law claims at least in some circumstances function free of implied preemption.

_____

[6] The passage in the Copyright Act of 1976 of 17 U.S.C. § 301, which preempts the copyright field, perhaps supersedes the field preemption function of implied preemption, but does not bar the application of implied preemption in its conflict preemption function. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (rejecting the argument "that implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute"). Our discussion of implied preemption in this opinion thus relates to its conflict preemption function.

The right of publicity imposes liability on "[o]ne who appropriates to his own use or benefit the name or likeness of another." Restatement (Second) of Torts § 652C (Am. Law Inst. 1977). While we know of no court decisions that barred application of a right of publicity claim on grounds of implied preemption, the Third Circuit has asserted that, where a right of publicity claim would conflict with the exercise, by a copyright holder or licensee, of the rights guaranteed by federal copyright law, that claim may be impliedly preempted. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1029–31 (3d Cir. 2008).[7] Further, prominent copyright scholars have suggested that implied preemption may bar a right of publicity claim where the claim does not further a distinct state interest, such as preventing "consumer deception," protecting privacy, or safeguarding against reputational harms. Rebecca Tushnet, *Raising Walls Against Overlapping Rights: Preemption and the Right of Publicity*, 92 NOTRE DAME L. REV. 1539, 1545–48 (2017); *see also* 1 NIMMER ON COPYRIGHT § 1.17[B][3][a] (noting that the "conflict between the right of

---

[7] *But see Brown v. Ames*, 201 F.3d 654, 659–61 (5th Cir. 2000) (concluding that right of publicity claims are not barred by implied preemption because they pose no risk of "undermin[ing] the copyright system").

13

publicity and copyright . . . [is] rooted more in conflict preemption and the Supremacy Clause . . . than in express preemption and Section 301").[8]

      We agree that implied preemption may provide a defense against a right of publicity claim which, if allowed to proceed, would impair the ability of a copyright holder or licensee to exploit the rights guaranteed under the Copyright Act, or in some way interfere with the proper functioning of the copyright system. It does not follow, however, that state law publicity interests are inevitably preempted whenever their recognition would burden the enjoyment of the benefits of copyright. The Copyright Act's grant of exclusive rights to disseminate (and to authorize the dissemination of) a work of authorship does not necessarily mean that those rights will effectively nullify significant rights established under state law whenever the application of the state law would impair or diminish exploitation of the federal right.

———————————————

[8] *See also* Jennifer E. Rothman, *Copyright Preemption and the Right of Publicity*, 36 U.C. DAVIS L. REV. 199, 208, 236 (2002) (arguing that "principles of the Supremacy Clause [should] determine when copyright law should preempt the right of publicity"); Guy A. Rub, *A Less-Formalistic Copyright Preemption*, 24 J. INTELL. PROP. L. 327, 345, 348 n.95 (2017) (arguing that "[c]onflict preemption should . . . be considered in practically every copyright preemption case" and "should not be reserved for unusual or extreme cases" because the Copyright Act's statutory preemption provision "does not seem to address all the situations in which copyright law and state law might conflict").

Federal copyright law does not entirely divest the states of authority to limit the exploitation of a work within copyright's subject matter in furtherance of sufficiently substantial state interests, such as protecting a person's privacy, compensating for fraud or defamation, or regulating unauthorized use of its citizens' personas. *Cf. Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 487 (1974) (holding that state trade secret law is not categorically preempted by federal patent law, noting that "[a] most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengeable" (footnote omitted)). A state may, for example, enact an anti-paparazzi statute that protects its citizens from unreasonable intrusions on personal privacy, *see, e.g.,* Cal. Civ. Code § 1708.8 (imposing liability for "captur[ing] any type of visual image . . . of the plaintiff engaging in a private, personal, or familial activity"), and a plaintiff may come to court to vindicate that state law interest notwithstanding that the claim, if successful, may have the collateral effect of precluding the defendant from exploiting a photograph that falls within the subject matter of federal copyright law. And a state may impose liability on the publication of misleading or false newspaper articles, notwithstanding

that the collateral effect of that liability would be to interfere with the ability

of the news media, under the copyright law, to exploit such articles for

commercial gain. *Cf.* H.R. Rep. No. 94-1476, at 132, *reprinted in* 1976

U.S.C.C.A.N. 5659, 5748 (1976) ("[Federal copyright law] is not intended to

preempt common law protection in cases involving activities such as false

labeling, fraudulent representation, and passing off even where the subject

matter involved comes within the scope of the copyright statute.").[9] In other

words, the mere fact that a state law claim would restrict or prevent certain

uses of a copyrightable work does not necessarily answer the question

whether that state law claim should be preempted on the ground that it

"stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of [the Copyright Act]." *Goldstein*, 412 U.S. at 561

(citation omitted).

A 1989 Supreme Court decision finding a state claim preempted by

federal patent law provides a helpful framework for us to determine when a

---

[9] *See also Factors Etc., Inc. v. Pro Arts, Inc.*, 496 F. Supp. 1090, 1100 (S.D.N.Y. 1980) (noting that the "right to exploit [a person's] name and image" for commercial purposes covers an "area unattended by federal law" and that a state law protecting that right is "neither contrary to nor preempted by federal law" (internal quotation marks omitted)), *rev'd on other grounds*, 652 F.2d 278 (2d Cir. 1981).

right of publicity claim should be barred under implied preemption. In *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, the Supreme Court considered whether a state law prohibiting the duplication of unpatented boat hull designs was preempted by the federal patent law. 489 U.S. 141 (1989). To determine the question of implied preemption, the Court explained that the States may not offer protection that would "render . . . fruitless" the element of patent law providing for "free competition in the exploitation of unpatented designs and innovations." *Id.* at 151–52.[10] However, the Court further explained that "the States may [nonetheless] place limited regulations on the circumstances in which such designs are used in order to prevent consumer confusion" and may provide protections for trade secrets "[d]espite the fact that [such] protection [is] available for ideas [that] clearly [fall] within the subject matter of patent" because "the nature and degree of [such] state protection [does] not conflict with the federal policies" underlying the patent law. *Id.* at 154–55 ("[A]ll state regulation of . . . unpatented subject matter is not *ipso facto* pre-

_____

[10] *See also id.* at 156–57 ("A state law that substantially interferes with the enjoyment of an unpatented utilitarian or design conception which has been freely disclosed by its author to the public at large impermissibly contravenes the ultimate goal of public disclosure and use which is the centerpiece of federal patent policy.").

empted by the federal patent laws," *id.* at 154). In its discussion of precedents as to the non-preemption by federal patent law of state trade secret law, the Court explained that "certain aspects of trade secret law operate[] to protect non-economic interests outside the sphere of congressional concern in the patent laws," specifically the right of "privacy, [which] is threatened when industrial espionage is condoned or is made profitable." *Id.* at 155 (citing *Kewanee Oil*, 416 U.S. at 487).

Turning to the state law at issue, the Court noted that "[i]t is readily apparent that the [] statute does not operate to prohibit 'unfair competition' in the usual sense that term is understood . . . [as a] tort of deceit . . . focus[ed] [] on the protection of consumers." *Id.* at 157. Instead, the statute "is aimed directly at preventing the exploitation of the design and utilitarian conceptions embodied in the product itself" and "creat[ing] an inducement for the improvement of boat hull designs." *Id.* at 158. For this reason, the Court held that the state law "conflicts with the federal [patent] policy" by permitting the "reassert[ion]" of "a substantial property right in [an] idea" lacking in federal patent protection. *Id.* at 159.

While *Bonito Boats* addressed the preemptive scope of the federal patent law, that case provides a general framework to determine whether right of publicity claims are precluded by reason of Copyright Act implied preemption. *Bonito Boats* instructs that analysis of implied preemption depends on whether the state law claim furthers substantial state law interests that are distinct from the interests served by the federal law which may preempt the claim. Accordingly, when a person undertakes to exert control over a work within the subject matter of the Copyright Act under a mechanism different from the one instituted by the law of copyright (*i.e.*, a state law claim), implied preemption may bar the claim unless the state-created right vindicates a substantial state law interest, *i.e.* an "interest[] outside the sphere of congressional concern in the [copyright] laws." *Id.* at 155.[11]

Many right of publicity claims would satisfy that standard. Some right of publicity claims, for example, target false endorsements, and as such

_____

[11] Our reference to "subject matter" here should not be taken to mean that, as a prerequisite to the implied preemption analysis, the court must conduct the subject matter inquiry inherent in the statutory preemption analysis. Instead, the focus is on whether the claim would have the effect of frustrating the functioning of the copyright laws. Here, as we explain in section c, it would.

vindicate a state's interest in "prevent[ing] consumer confusion." *Id.* at 154. A
state's interest in protecting its consumers from deception in the commercial
marketplace is clearly both substantial and distinct from the interest in
"grant[ing] valuable, enforceable rights to authors . . . to afford greater
encouragement to the production of literary (or artistic) works of lasting
benefit to the world" that underlies the federal copyright law. *Mazer v. Stein*,
347 U.S. 201, 219 (1954) (internal quotation marks and citation omitted); *see
also* Tushnet, *supra,* at 1545 (noting that "an element of consumer deception"
suffices to distinguish a right of publicity claim from a copyright claim for
purposes of preemption). Further, right of publicity claims that vindicate
privacy or reputational interests, or those that would prohibit the sale of
goods whose value to consumers consists predominantly of the unauthorized
exploitation of a person's valuable persona, *see Cardtoons, L.C. v. Major League
Baseball Players Ass'n*, 95 F.3d 959, 962–64 (10th Cir. 1996) (considering a right
of publicity claim based on the unauthorized use of the likenesses of baseball
players on parody baseball cards), vindicate substantial state law interests
that have little relation to the interests of a copyright holder to exclusive
control over works of authorship. *See Bonito Boats*, 489 U.S. at 155. The more

substantial the state law interest involved in the suit, the stronger the case to

allow that right to exist side-by-side with the copyright interest,

notwithstanding its capacity to interfere, even substantially, with the

enjoyment of the copyright. *See* Tushnet, *supra,* at 1548 (arguing that "a right

of publicity that furthers the protection of consumers, reputation, or

privacy . . . [should] not be preempted").

In contrast, the less substantial the state law rights invoked, or the more

the invocation of the state right amounts to little more than camouflage for an

attempt to exercise control over the exploitation of a copyright, the more

likely that courts will find the state law claim to be preempted. *Cf. Dreyer v.

Nat'l Football League,* 814 F.3d 938, 943 (8th Cir. 2016) (noting that, where a

right of publicity claim does not further the "state's interest in protecting

consumers," "that suit seeks to subordinate the copyright holder's right to

exploit the value of [the] work to the plaintiff's interest in controlling the

work's dissemination" under state law, and is therefore preempted).

We now turn to the question whether Jackson's Connecticut right of

publicity claim against Roberts asserts a sufficiently substantial state interest,

distinct from the interests underlying federal copyright law, to evade

21

preemption. The first question is whether Jackson even states an actionable claim of right of privacy. While there is very little Connecticut authority as to the boundaries of Connecticut's common law right of publicity, we can derive its probable scope from the Restatement (Second) of Torts. *See Goodrich v. Waterbury Republican-American, Inc*., 448 A.2d 1317, 1329 (Conn. 1982) (adopting the Restatement's definition of right of privacy and publicity torts). The Restatement provides that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652C. It explains that, while "[t]he common form of invasion of privacy . . . is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product," the rule is "not limited to commercial appropriation" and "applies also when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one." *Id.* cmt. b. The Restatement thus at least initially sets out what appears to be a highly inclusive definition of the tort; a defendant is unlikely to publish a reference to a plaintiff unless the defendant views it as being somehow to his personal benefit. However, the Restatement then

22

provides, more restrictively, that "the defendant must have appropriated . . . the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness," *id.* cmt. c, and that "[t]he value of the plaintiff's name is not appropriated by mere mention of it, . . . nor is the value of his likeness appropriated when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity," *id.* cmt. d.

It is difficult to see how Roberts's mere use of Jackson's name to identify him as the artist of the song Roberts samples, and his use of the sound of Jackson's voice, which is inevitable in sampling Jackson's performance of his song, "appropriated . . . [Jackson's] reputation, prestige, social or commercial standing, public interest or other values of [Jackson's] name or likeness." *Id.* cmt. c. "No one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation." *Id.* cmt. d. Nonetheless, Jackson's claim may *just barely* fall within the boundaries of Connecticut's right of publicity as Roberts undoubtedly believed it was to his personal benefit to include the references to Jackson in his mixtape. We will

23

assume (although without confidence) that the suit would not have been

dismissed by a Connecticut court for failure to state a claim upon which relief

may be granted.

Nonetheless, Jackson's claim does not seek to vindicate any substantial

state interests distinct from those furthered by the copyright law: as explained

further below, Roberts did not employ Jackson's name or persona in a

manner that falsely implied Jackson's endorsement of Roberts, his mixtape, or

his forthcoming album,[12] nor in a manner that would induce fans to acquire

or pay heed to the mixtape merely because it included Jackson's name and a

sound that could be identified as his voice. *Compare with Cardtoons*, 95 F.3d at

962–64. Nor is Roberts's reference to Jackson's persona in any way

derogatory, or an invasion of Jackson's privacy. *See* Tushnet, *supra*, at 1548

(suggesting that only right of publicity claims which "further[] the protection

_____

[12] As explained below, based on (a) the absence of any message of Jackson's
endorsement in the mixtape, (b) the evidence that it is common practice in the hip-
hop industry for artists to use copyrighted samples in mixtapes without the
permission of the copyright holders or performers of the sampled works (and to
reference the relevant performers by name in track titles), and (c) the context of
Roberts's use, we conclude that no reasonable listener could conclude that Roberts's
use of the "In Da Club" sample and of Jackson's stage name implied Jackson's
endorsement of Roberts, his mixtape, or his then-upcoming commercial album. *See
infra* at 56.

of consumers [against deception], [or the plaintiff's] reputation[] or privacy"
should survive implied preemption). The substantiality of Jackson's interest
in his invocation of Connecticut's right of publicity is therefore minimal.
Roberts's mere reproduction of a sound that can be recognized as Jackson's
voice, and his small discreet notation that correctly identifies Jackson as the
artist of the sample played, do not violate any substantial state law publicity
interest that Jackson possesses. To the contrary, the predominant focus of
Jackson's claim is Roberts's unauthorized use of a copyrighted sound
recording that Jackson has no legal right to control.

As Jackson's suit is directed against references to him in the context of
the reproduction, without his authorization, of a sample from his
performance of his famous song, in the absence of any substantial alleged
injury properly within the scope of the publicity right, the suit constitutes
little more than a thinly disguised effort to exert control over an unauthorized
production of a sample of his work. To the extent that the applicability of
implied preemption depends on an assessment of the substantiality of the
state law interest invoked by the plaintiff, Jackson's invocation of his right of
publicity in this context is at best sorely deficient.

25

We turn now to the other essential element of implied preemption to be balanced against the substantiality of the plaintiff's state law interest — the potential for conflict between the assertion of a state law claim invoked against the dissemination of works within the subject matter of copyright and the operation of the federal copyright system. We find a potential for conflict and impairment of rights established by the Copyright Act in two different respects.

Many works of authorship that fall within the subject matter of the Copyright Act include either depictions of real persons or appearances by real persons — such as actors or musicians in the performance of the work. To the extent that publication, reproduction, or performance of a work that either refers explicitly to a real person or exhibits real persons in its performance could support a suit for invasion of that real person's right of publicity, the potential for impairment of the ability of copyright holders and licensees to exploit the rights conferred by the Copyright Act is obvious and substantial. *See Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1145 (9th Cir. 2006) (warning that "the right of publicity [could be used as] a license to limit the copyright holder's rights" and that, "left to creative legal arguments, the [] right of

publicity could easily supplant the copyright scheme"); *Sinatra v. Goodyear Tire & Rubber Co.*, 435 F.2d 711, 718 (9th Cir. 1970) ("If a proposed licensee must pay each artist who has played or sung the composition and who might therefore claim [misappropriation of likeness], the licensee may well be discouraged to the point of complete loss of interest.").[13] Moreover, such suits could substantially interfere with the utilization of a work in ways explicitly permitted by the Copyright Act, such as for uses that would qualify as fair use under 17 U.S.C. § 107, or for uses of works in the public domain. A person who uses a work for "criticism, comment, news reporting, teaching, . . .

---

[13] We recognize that the Recording Agreement between Jackson and Shady/Aftermath offered Shady/Aftermath a means of avoiding the impairment of its copyright interest that might result from Jackson's ability to sue a licensee or assignee for violation of Jackson's right of publicity. The Recording Agreement, as noted above, assigned Jackson's right of publicity to Shady/Aftermath on an exclusive basis during the term of the Recording Agreement (through 2014) and thereafter on a non-exclusive basis. Accordingly, coincident with an assignment or grant of a license for "In Da Club," Shady/Aftermath could have assigned or licensed Jackson's right of publicity, providing the assignee or licensee with a complete defense against any such suit by Jackson. On the other hand, if Shady/Aftermath failed to license or assign the publicity right coincident with the license or assignment of the copyright, the assignee or licensee would be vulnerable to Jackson's interference with its copyright entitlement. The fact that Shady/Aftermath possesses a contractual right capable of counteracting the potential for interference with its rights does not nullify the potential for such right of publicity suits to interfere in the proper functioning of the copyright system.

scholarship, or research" in a manner expressly authorized by the fair use

provision of the Copyright Act might nonetheless incur liability to a person

depicted in the work under a state right of publicity law, for mere depiction

of her likeness, notwithstanding the express policy of the Copyright Act to

allow such usage.[14] *Cf. Bonito Boats*, 489 U.S. at 156–57. Similarly, a state law

that would impose liability on a defendant for use of a public domain work,

on the sole basis that the plaintiff is depicted in that work, would "interfere

with the federal policy . . . of allowing free access to copy whatever the

---

[14] We recognize that many statutory right of publicity laws include specific
exceptions for types of uses that might qualify as fair use under the copyright law.
*See, e.g.*, Cal. Civ. Code § 3344(d) (providing that the use of a name or likeness "in
connection with any news, public affairs, or sports broadcast or account, or any
political campaign, shall not constitute [a violation of the statute]"). The Restatement
provides the basis for a similar exception. *See* Restatement (Second) of Torts § 652C
("[A] newspaper . . . does not become liable under the rule stated in this Section to
every person whose name or likeness it publishes."). And, even if state law would
authorize a right of publicity suit against the use of a copyrighted work in a manner
that would qualify as a fair use under the Copyright Act, the First Amendment
might provide a strong defense. *See Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 158, 165 (3d
Cir. 2012) (adopting the "transformative use" test for evaluating First Amendment
defenses to right of publicity claims, which "import[s] the concept of
'transformative' use from copyright law," *id.* at 158). Nonetheless, while the First
Amendment and such provisions may reduce the risk of such overreaching by
publicity laws, the potential for conflict would persist in many instances.

federal . . . copyright laws leave in the public domain." *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 237 (1964).

Allowing Jackson's right of publicity suit to proceed would interfere with the functioning of the copyright system in another way as well. As explained above, Jackson's suit, although ostensibly an invocation of his rights to control the use of his persona in publicity, is so devoid of the substantial interests protected by that right that it is more properly seen as a thinly disguised effort by the creator and performer of a work within the subject matter of copyright — who owns no copyright interest in the work — to nonetheless exert control over its distribution, notwithstanding that the law of copyright confers the right to exercise such control exclusively on the rights holder. 17 U.S.C. § 106. Jackson's attempt though this suit to control the reproduction of "In Da Club" conflicts with and acts in derogation of the exclusive right of the rights holder to exercise such control.

We recognize that, pursuant to the Recording Agreement, there were limitations on Shady/Aftermath's authority to license the use of "In Da Club." The Recording Agreement contained a reservation. With certain exceptions, it did not allow Shady/Aftermath to license "In Da Club" for use in a

commercial or for use as a sample without Jackson's approval. Thus, Roberts's use of the sample was not only unauthorized by the rightsholder, but was also a use that the rightsholder could not authorize without Jackson's approval.

By reason of his unauthorized sampling, Roberts was presumably liable for copyright infringement to Shady/Aftermath, but not to Jackson. Jackson may have a right either to compel Shady/Aftermath to sue Roberts for copyright infringement, seeking damages on which Jackson might have been entitled to a royalty, or to seek damages from Shady/Aftermath for its failure to protect Jackson's right to royalties by suing Roberts. Even if Jackson possessed such rights against Shady/Aftermath, which in turn possessed rights it could have enforced against Roberts, Jackson possessed no legal right to directly control Roberts's use of the song. His attempt to do so under the disguise of a right of publicity claim was in derogation of Shady/Aftermath's exclusive right to enforce the copyright.

While it is true that Jackson's suit did not prevent Shady/Aftermath from itself suing Roberts for copyright infringement, Shady/Aftermath might have had good reason for not doing so. It might have considered Roberts's

30

use of "In Da Club," although unauthorized, to be beneficial to the commercial value of the song, and may therefore have preferred to tacitly permit Roberts's infringement of its copyright. The exclusive right of the copyright holder "to authorize" the reproduction or adaptation of a work of authorship must include the right to decide whether to tolerate an infringement. *Cf.* Tim Wu, *Tolerated Use*, 31 COLUM. J.L. & ARTS 617, 619 (2008) ("Tolerated use is infringing usage of a copyrighted work of which the copyright owner may be aware, yet does nothing about. . . . Reasons [for non-enforcement] can include simple laziness or enforcement costs, a desire to create goodwill, or a calculation that the infringement creates an economic complement to the copyrighted work — it actually benefits the owner."). Jackson's direct suit against Roberts interferes with that right by attempting to step into Shady/Aftermath's shoes and impose liability on Roberts for the reproduction and adaptation of "In Da Club."

We recognize that there are weaknesses in Roberts's assertion of preemption against Jackson. For one, implied preemption is typically invoked to protect against suit one who is *lawfully* reproducing or publishing a copyright-protected work. *See Facenda*, 542 F.3d at 1028–32 (analyzing

potential preemption of right of publicity claim based on the defendant's use

of a work to which the defendant held the copyright). Roberts, in contrast, has

no rights in the copyrighted work. Furthermore, as explained above, it is not

clear that Jackson's suit's interference with Shady/Aftermath's exclusive right

to seek copyright remedies had any substantial adverse effect on

Shady/Aftermath's ability to exploit its rights, although we can envision

circumstances in which a Shady/Aftermath copyright licensee's ability to

exploit its copyright entitlement would be frustrated by a similar suit. *See*

*supra* note 13. We conclude that the policy considerations justifying the

doctrine of implied preemption prevail, so that Jackson's insubstantial claim

of violation of his publicity is precluded.

> b. *Statutory Preemption*

Roberts also contends that Jackson's right of publicity claim is

preempted by § 301 of the Copyright Act. We refer to this category of

preemption as "statutory preemption." The purpose of statutory preemption

is essentially to ensure a nationwide, uniform federal copyright system,

ousting the states from imposing any control of the area. *See* H.R. Rep. No. 94-

1476, at 129 ("Section 301 . . . adopts a single system of Federal statutory

copyright . . . ."). Section 301 reads as follows:

> On and after January 1, 1978, all legal or equitable rights that are
> equivalent to any of the exclusive rights within the general scope
> of copyright as specified by section 106 in works of authorship that
> are fixed in a tangible medium of expression and come within the
> subject matter of copyright as specified by sections 102 and 103,
> whether created before or after that date and whether published
> or unpublished, are governed exclusively by this title. Thereafter,
> no person is entitled to any such right or equivalent right in any
> such work under the common law or statutes of any State.

17 U.S.C. § 301(a). Our court has interpreted the statute as directing a two-

part analysis for determining whether a state law claim is preempted under

§ 301. *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir.

1983), *rev'd on other grounds,* 471 U.S. 539 (1985). What we will call the "first"

prong, although it is mentioned second in the text of the statute, looks at the

work that would be affected by the plaintiff's exercise of a state-created right,

and requires (as an essential element of preemption) that the work "come

within the subject matter of copyright as specified by sections 102 and 103."

17 U.S.C. § 301(a).[15] Accordingly, if the work against which the plaintiff

---

[15] Section 102(a) provides that "[c]opyright protection subsists . . . in original works
of authorship fixed in any tangible medium of expression, now known or later

claims rights is a "literary work[]," a "musical work[],"a "sound recording[],"
or any other category of "work[] of authorship" within the "subject matter of
copyright" (even if the subject of the claim is for some reason ineligible for
copyright protection[16]) the plaintiff's claim is subject to the possibility of
statutory preemption. 17 U.S.C. § 102(a); *Harper & Row*, 723 F.2d at 200
(holding that memoirs are "literary works" falling within the subject matter of
copyright).

The second prong looks at the right being asserted (over a work that
comes within the "subject matter of copyright") and requires (for preemption
to apply) that the right be "*equivalent* to any of the exclusive rights within the
*general scope of copyright* as specified by section 106." 17 U.S.C. § 301(a)

———————————————

developed, from which they can be perceived, reproduced, or otherwise
communicated, either directly or with the aid of a machine or device," and provides
that "[w]orks of authorship include . . . (2) musical works, including any
accompanying words; . . . [and] (7) sound recordings." 17 U.S.C. § 102(a). Section
103, which addresses compilations and derivative works, is not relevant to our
analysis.

[16] *See* H.R. Rep. No. 94-1476, at 131 ("As long as a work fits within one of the general
subject matter categories of sections 102 and 103, [Section 301] prevents the States
from protecting it even if it fails to achieve Federal statutory copyright protection
because it is too minimal or lacking in originality to qualify, or because it has fallen
into the public domain."); *see also Harper & Row*, 723 F.2d at 200 (citing H.R. Rep. No.
94-1476).

(emphasis added). This prong is often referred to as the "general scope" requirement of preemption. *See, e.g., Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004). To more clearly distinguish this second requirement from the "subject matter" prong, we refer to it as the "equivalence" requirement. Section 106 defines the "exclusive rights" granted by the federal copyright law, which consist of the rights "to do and to authorize" the reproduction, distribution, performance, and display of a work, and the creation of derivative works based on a work. 17 U.S.C. § 106. With respect to what the statute means by "equivalent," we have stated as a general proposition (later somewhat refined, as discussed below), that state law rights are equivalent to those within copyright's general scope "[w]hen [those state law rights] may be abridged by an act which, in and of itself, would infringe one of the exclusive rights [provided in Section 106] . . . . Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur." *Harper & Row*, 723 F.2d at 200.

This *Harper & Row* summary of the meaning of equivalency is somewhat overbroad in its description of both the circumstances where the right is equivalent (and therefore subject to preemption) and those where it is not equivalent (and not subject to preemption). As for the former, the test would sweep in every claim based on right of publicity or privacy directed against a work within the subject matter of copyright because every such claim would assert abridgment of the right by an act of reproduction, distribution, or performance that, "in and of itself, would infringe one of the exclusive rights" of copyright. *Id.* at 200.

And as for non-equivalency, the *Harper & Row* formulation suggests that the mere presence of an extra element beyond those required for copyright infringement would preclude preemption (with the consequence that no publicity claim would ever be precluded, as such claims typically require the "appropriat[ion] . . . [of a] name or likeness," *see* Restatement (Second) of Torts § 652C). While we have indeed begun by inquiring whether "an extra element is required instead of or in addition to" what is required for a copyright infringement claim, *Comput. Assocs. Int'l., Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) (citations and internal quotation marks omitted),

36

not all "extra elements" are sufficient to remove the claim from the "general scope" of copyright. The critical inquiry is whether such extra elements of the state law claim beyond what is required for copyright infringement "change[] the nature of the action so that it is *qualitatively* different from a copyright infringement claim." *Id*. (internal quotation marks omitted). "An action will not be saved from preemption by elements . . . which alter the action's *scope* but not its *nature*." *Id*. at 717 (emphases added) (internal quotation marks omitted).[17]

---

[17] One prominent copyright treatise has cautioned against "mechanical decision making that merely inquires whether any extra element can be found in the state claim [] beyond that necessary to give rise to a copyright infringement violation." 6 PATRY ON COPYRIGHT § 18:19, Westlaw (database updated Mar. 2020). It urges: "Instead of focusing on . . . the presence or absence of extra elements, the proper approach is to determine whether the elements of the state claim are qualitatively different in nature from the elements of a copyright cause of action." *Id.* While we have inquired into the existence of extra elements in determining whether preemption applies, *see, e.g.*, *Altai*, 982 F.2d at 716; *Briarpatch*, 373 F.3d at 305–06; *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 850 (2d Cir. 1997), our precedents support the view that the determination should not depend on a "mechanical" search for extra elements, but, as we stated in *Altai*, requires a holistic evaluation of the nature of the "rights sought to be enforced," and a determination whether the state law action "is *qualitatively* different from a copyright infringement claim." *Altai*, 982 F.2d at 716; *cf. Ritchie v. Williams*, 395 F.3d 283, 287 n.3 (6th Cir. 2005) (criticizing the "extra element" test, noting that it "does not provide any real guidance to the courts" (quoting Schuyler Moore, *Straightening Out Copyright Preemption*, 9 UCLA ENT. L. REV. 201, 204 (2002))). The text of the statute — which does not mention "extra elements" — supports this view.

Under this test, we have upheld § 301 preemption as to a variety of state law claims that included an "extra element" — including claims of unfair competition,[18] unjust enrichment,[19] conversion,[20] tortious interference with contractual relations,[21] and commercial misappropriation[22] — when the extra element was not of such important character as to differentiate the claim

--------

[18] *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (holding that plaintiff's state law unfair competition claim, based on defendants' use of plaintiff's book in a motion picture, was preempted "to the extent it seeks protection against copying of . . . [the] book"); *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 247 (2d Cir. 1983) (same).

[19] *Briarpatch*, 373 F.3d at 306–07 (holding that plaintiffs' unjust enrichment claim, based on the theory that defendants were "unjustly enriched by turning [plaintiff's novel] into a motion picture without compensating [plaintiff] or obtaining . . . permission" was preempted under § 301 because "it is clear that the specific right [plaintiff is] . . . trying to enforce is the right of adaptation—*i.e.* the right to prepare or authorize preparation of a derivative work").

[20] *Harper & Row*, 723 F.2d at 201 (holding plaintiff's conversion claim, to the extent based on the "unauthorized publication" of excerpts from a manuscript, preempted because "the right [plaintiffs] seek to protect is coextensive with an exclusive right already safeguarded by the Act—namely, control over reproduction and derivative use of copyrighted material").

[21] *Id.* at 201 (holding that plaintiff's tortious interference claim, based on the defendant's "act of unauthorized publication," is preempted because it seeks to vindicate the right to control creation of derivative works).

[22] *Motorola*, 105 F.3d at 851–54 (holding that state law commercial misappropriation claim brought by the NBA against pager service that delivered real-time game scores was preempted, because the allegations supporting the NBA's claim were "virtually synonymous [with] wrongful copying and are in no meaningful fashion distinguishable from infringement of a copyright").

substantially from a copyright claim. On the other hand, we have recognized

that other state law claims based on uses of works within the "subject matter

of copyright" — including claims alleging breaches of fiduciary duty,[23]

"unfair competition claims based upon breaches of confidential

relationships,"[24] and trade secret claims[25] — survive preemption when such

claims include a sufficiently significant "extra element" that "qualitatively

distinguishes such . . . [claims] from claims for copyright infringement." *Altai*,

982 F.2d at 717.

---

[23] *Briarpatch*, 373 F.3d at 307 (holding that breach of fiduciary claim survives preemption because "the underlying right [plaintiffs] seek to vindicate is the right to redress violations of the duty owed to a partnership by those who control it," and noting that "the fact that these claims require a finding that there was a breach of fiduciary duty . . . adds an extra element that makes the claims qualitatively different from a claim of copyright infringement").

[24] *Altai*, 982 F.2d at 717 (noting that "unfair competition claims based upon breaches of confidential relationships" are not preempted (citing *Balboa Ins. Co. v. Trans Glob. Equities*, 218 Cal. App. 3d 1327, 1339–53 (Ct. App. 3d Dist. 1990) (holding that § 301 does not preempt unfair competition claims "based on trade secret and breaches of confidence or fiduciary duty," *id.* at 1339))).

[25] *Id.* (holding that "[t]he defendant's breach of duty is the gravamen of [certain] trade secret claims, and supplies the 'extra element' that qualitatively distinguishes such trade secret causes of action from claims for copyright infringement that are based solely upon copying").

*1.     Subject Matter Requirement*

As explained above, the first prong looks at the work against which the plaintiff seeks to exercise a state-created right and requires that such work come within the "subject matter of copyright." In analyzing this issue, courts have occasionally encountered difficulty identifying the focus of the particular state law claim. When a right of publicity claim is based entirely on the defendant's use of a work that falls within the subject matter of copyright (*e.g.*, a photograph or a sound recording) that depicts or otherwise embodies the plaintiff's likeness (*e.g.*, her visual appearance or voice), it can be unclear whether the focus of the plaintiff's claim is the likeness of the plaintiff or the copyrighted work embodying that likeness. *See, e.g., Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1011 (9th Cir. 2017) (considering preemption of a right of publicity claim based on the use of photographs of plaintiffs, and querying whether the focus of the claim is the photographs themselves or the "'likeness' or 'persona'" exhibited in the photographs).

Jackson argues that his "claim's subject is the unauthorized commercial use of [his] *identity* [*i.e.*, the sound of his voice, recognizable as his, and his stage name] — not the use of the copyrighted work itself." Br. for Appellant

at 3. As Jackson points out, neither stage names nor voices — nor a person's "identity" or "likeness" — are "works of authorship" that fall within the subject matter of copyright. *See id.*; *see also Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005) ("A person's likeness—her persona—is not authored and it is not fixed."); U.S. Copyright Office, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 313.4(C) (3d ed. 2014) ("COMPENDIUM") ("Words and short phrases, such as names, titles, and slogans, are not copyrightable because they contain a de minimis amount of authorship."). Accordingly, to the extent that the subject of Jackson's claim is limited to Roberts's use of sound that is recognizable as his voice or his stage name, Jackson's claim would not be preempted by § 301. On the other hand, Jackson's claim also may be seen as one that seeks to control the reproduction of a copyrightable work: Jackson's "In Da Club" and his performance of it. So viewed, the focus of Jackson's claim would be a musical composition and a sound recording of a performance of it, which clearly fall within the "subject matter of copyright," in which case, Jackson's claim would be subject to § 301 preemption.

41

Courts have invoked § 301 to justify preemption of right of publicity claims, notwithstanding the contentions of the plaintiffs that their suits were directed against unauthorized use of their names or likenesses, on the conclusion that the invocation of the publicity right was a pretextual justification for an effort to prevent or otherwise control the reproduction or dissemination of a copyrighted work. In *Ray v. ESPN, Inc.*, for example, the Eighth Circuit considered a right of publicity claim brought by Steve "Wild Thing" Ray, a former professional wrestler, against ESPN, alleging that ESPN re-broadcast films of his early 1990s wrestling bouts without his permission. 783 F.3d 1140, 1141 (8th Cir. 2015). (ESPN had acquired permission to use the films from the copyright holder.) In response to ESPN's statutory preemption defense, Ray argued that his claims were outside the "subject matter or ambit of the Copyright Act" because the "focal point of . . . [the] case" was not ESPN's use of the films, but ESPN's use of Ray's uncopyrightable likeness as embodied in the films. *Id.* at 1143. The court rejected that argument, instead holding that the focus of the claim was ESPN's use of the films themselves, which were clearly "within the subject matter of copyright law," *see* 17 U.S.C. § 102(a)(6), and holding that Ray's claim was an "attempt to merely prevent

42

rebroadcast of a copyrighted film." *Id.* at 1143–44 (internal quotation marks omitted). Finding that Ray's claim was equivalent to a copyright infringement claim, the court held that the claim was barred by § 301. *Id.* at 1144.

Similarly, in *Laws v. Sony Music Entertainment, Inc.*, the Ninth Circuit considered a right of publicity claim brought by Debra Laws, a recording artist, against a recording company, which had used a sample from Laws's song (with permission from the copyright holder) in a different song. 448 F.3d at 1136. Laws argued that the "subject matter" of her right of publicity claim was her uncopyrightable "persona and likeness," *i.e.* her voice as captured in the sample; the defendant argued that the subject matter of the claim was really the copyrightable *recording* of Laws's performance. *Id.* at 1139. The court concluded that Laws's claim focused on the *recording*, not the voice embodied therein. *Id.* at 1141. Accordingly, the court held that the claim was within the subject matter of copyright. *Id.* at 1143.[26]

---

[26] The majority of courts to consider similar claims have reached the same result. *See, e.g., Maloney.*, 853 F.3d at 1011 (holding that a right of publicity claim challenging "the copyright holder's decision to distribute . . . copyrighted images [depicting the plaintiffs, two NCAA basketball players] . . . by selling consumers a non-exclusive license to download a chosen photograph from the NCAA Photo Library" was preempted); *Dryer v. Nat'l Football League*, 814 F.3d 938, 942 (8th Cir. 2016) (right of

On the other hand, the mere fact that a defendant's alleged invocation of the plaintiff's identity is through use of a copyrighted work does not necessarily mean that the claim of invasion of the right of publicity is an attempt to control that work and is therefore subject to preemption. For example, when a defendant exhibits an image or representation of the plaintiff embodied in a copyrighted work in a manner that appears to communicate a message that the plaintiff endorses the defendant's service or product (other than the copyrighted work in which the plaintiff appears),[27]

_____

publicity claim based on NFL Films' use of footage depicting plaintiffs' performance during football games preempted "[b]ecause the [plaintiffs] do not challenge the NFL's use of their likenesses or identities in any context other than the publication of [the] game footage"); *Romantics v. Activision Publ'g, Inc.*, 574 F. Supp. 2d 758, 766–67 (E.D. Mich. 2008) (right of publicity claim based on defendants' re-recording of plaintiffs' song, which plaintiffs claimed appropriated their "distinctive sound," was preempted because plaintiffs' allegations were focused on the defendants' "attempt[] to reproduce [plaintiffs'] *sound recording*"); *Butler v. Target Corp.*, 323 F. Supp. 2d 1052, 1056 (C.D. Cal. 2004) (right of publicity claim based on the defendant's use of plaintiffs' song preempted because "[p]laintiffs have not alleged that the [defendants'] Commercials used impersonations of their voices, but the [copyrighted sound] Recording itself"); *Cummings v. Soul Train Holdings LLC*, 67 F. Supp. 3d 599, 603 (S.D.N.Y. 2014) (plaintiff musician's right of publicity claim, based on defendants' authorized use of recordings of the TV program "Soul Train" containing plaintiff's performances, was preempted).

[27] We note the important difference between, on the one hand, the use of a person's likeness that implies endorsement of or voluntary association with the copyrightable work in which that likeness is embodied, and, on the other hand, the use of a person's likeness that implies endorsement of an entirely separate product or

courts have generally found that such a claim is not preempted. *See infra*

(discussing *Downing*). Thus, the fact that Roberts's use of Jackson's identity

was through Roberts's use of a copyrighted work (the "In Da Club" sample)

does not mean that Jackson's claim is necessarily preempted by § 301. In

*Downing v. Abercrombie & Fitch*, for example, the Ninth Circuit considered a

right of publicity claim brought by a group of professional surfers, alleging

that Abercrombie, in its marketing of apparel, had misappropriated their

likenesses by using a photograph of them at a surfing competition. 265 F.3d

994, 999–1000 (9th Cir. 2001). Abercrombie had "create[d] t-shirts[] exactly

like those worn by the [plaintiffs] in the photograph" and had advertised

those t-shirts alongside the photograph of the similarly clad plaintiffs, thus

conveying a false implication that the plaintiffs were wearing Abercrombie

shirts and represented Abercrombie as brand ambassadors. *Id.* at 1000. Like

the defendants in *Ray* and *Laws*, Abercrombie had used the photograph with

permission from the copyright holder. *Id.* at 1000. And, like the plaintiffs in

––––––––––––––––––––

service. A person's appearance in a copyrightable work — *i.e.*, an actor's appearance
in a film — will in most (but not all) circumstances serve to communicate that the
person depicted has consented to appear in that work, and has, at least to some
extent, endorsed the work itself. That kind of implication of endorsement is
immaterial to this analysis.

*Ray* and *Laws*, the *Downing* plaintiffs argued that their claim should survive

preemption because the "subject matter" of their claim was the

misappropriation of their likenesses, *not* the copyrighted photograph that

contained their likenesses. The Ninth Circuit concluded that the "basis for

[plaintiffs'] claim[]" was not the "publication of the photograph" but the "use

of the [plaintiffs'] likenesses . . . pictured in the published photograph." *Id.* at

1003. Accordingly, the court held that the claim fell outside the "subject

matter of copyright" and escaped preemption. *Id.* at 1005; *see also Toney*, 406

F.3d at 910 (right of publicity claim based on defendant's use of a photograph

of plaintiff on packaging for a hair product not preempted).

Under these precedents, the question whether the focus of Jackson's

claim is the recognizable sound of his voice (which is not within the subject

matter of copyright) or the copyrighted work in which that voice is embodied

(which, of course, is within the subject matter of copyright) would depend on

the gravamen of the claim and the allegations supporting it. The "crux of the

issue," the Ninth Circuit explained in *Maloney*, is whether "[the] claim seeks

to vindicate misuse of an individual's likeness, as opposed to merely

interfering with the distribution, display, or performance of a . . . work." 853

46

F.3d at 1012–13. In general, when a defendant uses material within the subject matter of copyright depicting a plaintiff's likeness in a manner that falsely "suggest[s] that the [plaintiff] had endorsed the defendant's products," courts have found that the focus of the right of publicity claim is the plaintiff's uncopyrightable *likeness* or *persona*. *Ray*, 783 F.3d at 1143 (internal quotation marks omitted) (discussing *Laws* and *Downing*); *Laws*, 448 F.3d at 1141 (same); *see also* J. Thomas McCarthy & Roger E. Schechter, RIGHTS OF PUBLICITY AND PRIVACY § 11:50, Westlaw (database updated May 2020) (explaining that preemption does not apply when the right of publicity claim "concerns the use of a human identity to attract attention to advertising of a commercial product or service"). This is because the gravamen of that kind of right of publicity claim is the defendant's usurpation of the plaintiff's *identity* to sell a product or service with which the plaintiff has no relevant connection. *Toney*, 406 F.3d at 910 (noting that "[t]he basis of [the plaintiff's] right of publicity claim concerns the message [that] the plaintiff endorses, or appears to endorse the product in question"). The fact that the defendant employed a copyrighted work to depict the plaintiff is beside the point. *See id.* ("Clearly the defendants used [the plaintiff's] likeness without her consent [to imply

her endorsement of their product]. The fact that the photograph itself could

be copyrighted . . . is irrelevant to the [right of publicity] claim."). Under these

circumstances, the right of publicity claim necessarily survives § 301

preemption because the claim does not assert rights "in works of authorship

that . . . come within the subject matter of copyright." 17 U.S.C. § 301(a).

 In our view, the pertinent distinction for such analysis is whether, on

the one hand, the defendant's use of a work involving the plaintiff's likeness

seeks advantage[28] for the defendant on the basis of the plaintiff's identity —

as where the plaintiff is identified in a manner that implies the plaintiff's

endorsement, sponsorship, or approval (or in some cases the plaintiff's

---

[28] Some courts have focused as a test of whether the plaintiff's claim escapes preemption on whether the defendant's use of the plaintiff's likeness was for "commercial advantage," *Toney*, 406 F.3d at 910, or its use of the plaintiff's likeness or name was "in an advertisement . . . *to promote its commercial products*," *Ray*, 783 F.3d at 1144 (emphasis added). In our view, this is imprecise — in some respects too broad, and in others too narrow. It is too broad in the sense that any commercial use of material is surely intended to serve the user's commercial advantage, regardless of whether that advantage somehow depends on the depiction of the persona of the plaintiff. The formulation is also too narrow in the sense that a plaintiff should legitimately be entitled to claim the right of publicity where the defendant appropriates the plaintiff's persona to advance a non-commercial cause, as by falsely representing that the plaintiff supports a political candidate or a controversial cause.

disapproval or rejection[29]) of the defendant or its product, or holds opinions favored (or disfavored) by the defendant, or where (as with baseball cards, *see Cardtoons*, 95 F.3d at 962–64) the value of what the defendant distributes lies in its reference to the identity of the plaintiff shown — what might be called "identity emphasis,"[30] which argues against preemption — or whether, on the other hand, the advantage sought by the defendant flows from the reproduction or dissemination of the work itself (as opposed to the persona of the plaintiff), which argues in favor of preemption.[31]

———————————

[29] While the most common instances are likely to be a defendant's use of the plaintiffs' likeness to imply endorsement, "identity emphasis" would also be present in the rarer circumstance where the defendant seeks advantage by depicting an unpopular plaintiff in a manner suggesting that person's dislike of the defendant or its product, or using the plaintiff's identity in a negative way to generate interest in the defendant or the defendant's work.

[30] Of course, even if a plaintiff's claim centers around the defendant's identity-emphasizing usage of the plaintiff's persona as depicted in a piece of copyrighted material, contracts that are binding on the plaintiff may nonetheless bar the plaintiff from bringing such a suit, and in such circumstances, reliance on the contractual bar may obviate the need for the court to consider the potentially more complicated question of preemption.

[31] While we think that this mode of analysis is appropriate for determining whether a state law claim is subject to preemption, there is support, with which we agree, for the notion that it fits more appropriately in the analysis of the second, "equivalence" requirement for statutory preemption — which looks to the nature of the plaintiff's claim and of the rights asserted — rather than in the analysis under the first requirement of whether the work against which the state law claim is directed is within the subject matter of copyright. *See Dryer*, 814 F.3d at 942–43 (noting, in a

In *Downing*, the plaintiffs' claim survived preemption because

Abercrombie had used their photograph to promote Abercrombie's products

_____

discussion of the "equivalence" requirement, that "a right-of-publicity suit challenging the use of a copyrighted work in a commercial advertisement" would be non-equivalent, but a similar suit "challeng[ing] the . . . exploit[ation] [of] the value of [the] work [itself]" would "assert[] rights equivalent to" the rights granted under copyright); Tushnet, *supra*, at 1545 (discussing *Dryer* with approval and noting that "[w]ithout an element of consumer deception [*i.e.* an implication of false endorsement] there was nothing 'extra' distinguishing the right of publicity [claim from a copyright claim]"); *see also* H.R. Rep. No. 94-1476, at 132 ("The evolving common law rights of 'privacy,' [and] 'publicity' . . . would remain unaffected [by § 301 preemption] *as long as the causes of action contain elements, such as an invasion of personal rights . . . that are different in kind from copyright infringement*." (emphasis added)). The first requirement focuses on whether the work against which the plaintiff's claim is directed is within the "subject matter of copyright." 17 U.S.C. § 301(a). That question can be answered entirely without reference to the nature of the plaintiff's claim. It is the second requirement that examines the plaintiff's claim to determine whether it is "equivalent to any of the exclusive rights within the general scope of copyright." H.R. Rep. No. 94-1476, at 130; *see also Altai*, 982 F.2d at 716 (to analyze equivalence prong, "we must determine 'what plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced'" (citation omitted)). The focus of the plaintiff's claim — and the nature of the rights claimed — is highly pertinent to the latter inquiry, but arguably irrelevant to whether the work that would be affected by the plaintiff's claim falls within the "subject matter" of copyright. Courts that have applied this analysis to the first requirement appear to have confused examination of the "subject matter" of the plaintiff's claim with the statute's reference to whether the work affected is within the "subject matter" of copyright. *See, e.g., Maloney*, 853 F.3d at 1011 ("The subject matter of the [plaintiffs'] state law claims — the photographs — therefore appears to fall within the subject matter of copyright" (internal quotation marks, alterations, and citation omitted)). This confusion rarely if ever makes a difference in the ultimate conclusion because the focus of the plaintiff's claim will determine whether the claim is or is not precluded, regardless of whether it is considered in analyzing the "subject matter" or "equivalence" requirements of § 301.

in a way that implied that the plaintiffs were Abercrombie brand ambassadors. 265 F.3d at 1000. As the Ninth Circuit later explained, the defendant had used the photograph in a way that "went well beyond mere republication of the photograph," instead publishing it "in connection with a broad surf-themed advertising campaign, identif[ying] the plaintiffs-surfers by name, and offer[ing] for sale the same t-shirts worn by the plaintiffs in the photo . . . suggest[ing] that the surfers had endorsed Abercrombie's t-shirts." *Laws*, 448 F.3d at 1141 (discussing *Downing*). It was on this basis that the court concluded that the "subject matter" that was the focus of the right of publicity claim was the "use of the [plaintiffs' uncopyrightable] likenesses" — and not the use of the photograph itself. *Id.*

By contrast, when the defendant's use does not seek to secure advantage through identity emphasis, but the right of publicity claim rather seeks to exert "control of the [copyrighted] work itself," the focus of the right of publicity claim is the work that exhibits the plaintiff's likeness (rather than the likeness itself) and the claim can therefore be subject to statutory preemption. *Id.* at 1142. In other words, the more the defendant has used a copyrighted work for its own value, as opposed to using it to exploit the

51

depicted plaintiff's identity, the more the right of publicity claim brought by someone depicted in the work can be considered a disguised effort to control the dissemination of the work. *See, e.g.*, *Ray*, 783 F.3d at 1144 (noting that "ESPN did not use Ray's likeness or name in an advertisement without his permission to [imply Ray's endorsement of] its commercial products" and concluding on that basis that the subject matter of the claim is the copyrighted film depicting Ray's likeness).[32] The gravamen and focus of the claim would be the defendant's use of the work, *not* the defendant's incidental use of the likeness of someone seen in the work.

Accordingly, a crucial issue in determining whether Jackson's right of publicity claim is subject to preemption depends on whether Roberts's use of Jackson's stage name and the "In Da Club" sample could reasonably be construed by the intended audience as a false implication of Jackson's endorsement or sponsorship of Roberts or his product.[33] To contradict any

---

[32] *See supra* note 28 (discussing the above-quoted language from *Ray*).

[33] We focus on whether Roberts's use implied Jackson's endorsement or voluntary association with Roberts, the mixtape, or Roberts's commercial album because that is Jackson's principal argument as to preemption on appeal. *See* Br. for Appellant at 17. We do not mean to suggest that, in order to survive preemption, a plaintiff *must* allege that the defendant's falsely implied endorsement or sponsorship. To the

such implication, Roberts offers evidence that, in the hip-hop industry, it is common practice for artists to sample each other's work without permission, and to credit the artists they sample on mixtapes without authorization, with designation (*e.g.*, a "ft." line) in a track title, just as Roberts referenced Jackson's stage name in the title of his remix ("In Da Club (Ft. 50 Cent)"). Indeed, Jackson himself, as he admitted in his deposition, has used vocal and instrumental samples from other well-known artists, sometimes identifying them by name, in his own mixtapes without permission.

In our view, this evidence powerfully supports the conclusion that, in the hip-hop world, the mere use, without more, of a sample from a well-known song, with acknowledgment of the identity of the sampled artist, does

---

contrary, many right of publicity claims would survive preemption where the defendant has otherwise exploited the plaintiff's identity to gain an advantage. *See, e.g., Factors Etc.*, 652 F.2d at 289 (Mansfield, J., dissenting) (arguing that a right of publicity claim challenging the unauthorized use of a photograph of Elvis Presley on a memorial poster is not preempted because "[t]he right of publicity protects an interest which copyright does not[:] . . . [the interest] against the unauthorized appropriation of an individual's very persona which would result in unearned commercial gain to another"). While the distinction we draw between seeking advantage through identity emphasis and seeking to control the copyrighted work itself may on occasion present close cases, here, Jackson's sole argument for avoiding preemption is that Roberts's use falsely implied his endorsement or voluntary association. As further explained below, we find no basis for that contention.

not communicate to the relevant audience that the sampled artist has endorsed or sponsored the sampling artist's work. In this manner, Roberts is expressing himself as an artist by his choice of sampled works, without implying that the artists so depicted have lent their personas to the promotion of his album. Absence of endorsement is further shown by the fact that the sampled song was so well known for years prior to Roberts's mixtape that it could not possibly be understood to be material Jackson created specifically for inclusion in the mixtape, and by the fact that *Renzel Remixes* employed samples from the works of at least 26 recording artists and identified 18 of those artists in the track titles. It would be unreasonable for a listener to conclude, simply based on Roberts's use of these samples and his references to those artists' stage names, that each of these well-known artists — including Adele, Nas, Snoop Dogg, Kendrick Lamar, and Lil Wayne — endorsed or sponsored Roberts's free mixtape. *See, e.g., Laws*, 448 F.3d at 1136, 1141 (holding preempted a right of publicity claim based on the use of Debra Laws's name and a sample of her song "Very Special" in Jennifer Lopez's song "All I Have").

54

This case differs significantly from those in which courts have found that the use of a plaintiff's image or persona could communicate endorsement or sponsorship. As noted, in *Downing*, for example, Abercrombie had done far more than reproduce a photograph depicting the plaintiffs: Abercrombie had "create[d] t-shirts[] exactly like those worn by the [plaintiffs] in [the] photograph" and had advertised those t-shirts alongside the photograph in its marketing materials, creating the false impression that the plaintiffs were wearing Abercrombie merchandise. 265 F.3d at 1000. "By doing so, [Abercrombie] suggested that the surfers had endorsed Abercrombie's t-shirts." *Laws*, 448 F.3d at 1141 (discussing *Downing*). And in *Toney*, the defendant (a hair products company) had used the plaintiff model's likeness both in "national magazine advertisements for [its product]," and on the packaging for that product in a context that suggested that the plaintiff had used the product and intended to be seen as endorsing the defendant's product. 406 F.3d at 907. In both cases, the context of the defendant's use clearly supported the implication of endorsement.

Here, there is no such contextual implication of endorsement. Nothing in Roberts's mixtape suggests Jackson's endorsement or sponsorship: Jackson

does not appear on the cover of the mixtape, *see* App'x at 138; nor do any of Roberts's lyrics refer to Jackson, *see* App'x at 127–28; nor is the "In Da Club" sample used in a manner that could mislead listeners into believing that it was new material that Jackson had created specifically for inclusion in Roberts's mixtape. Jackson's music and stage name were presented in the same manner as the music and names of numerous other sampled artists. *See* App'x at 138.

Although Roberts presented no evidence directly addressing how the relevant audience would understand and interpret the use of the Jackson sample and name, the combination of (a) the absence of any apparent message of endorsement, (b) the evidence that it is commonplace for hip-hop artists to so sample each other's songs without permission, and (c) the large number of artists other than Jackson who were similarly sampled and identified by Roberts compels the conclusion that there is no substantial likelihood that the audience could reasonably construe Roberts's use of the "In Da Club" sample, credited to Jackson, as a suggestion that Jackson had endorsed Roberts, his mixtape, or his upcoming commercial album. We conclude that the gravamen of Jackson's right of publicity claim, to the extent

56

it is based on the use of the "In Da Club" sample, is not the use of his identity but rather the use of the copyrighted work itself, and that the focus of Jackson's claim therefore comes within the "subject matter of copyright."[34]

### 2. *"Equivalence" or "General Scope" Requirement*

As noted above, the "equivalence" or "general scope" requirement for statutory preemption turns on whether the right asserted against the use of a work within the subject matter of copyright is equivalent to a right within the general scope of copyright. 17 U.S.C. § 301(a). Roberts's preemption defense would fail as a matter of law if Jackson's claim sought to assert rights that were not "equivalent to any of the exclusive rights within the general scope of copyright." *Id.* § 301(b)(3). The district court assumed, without support, that Connecticut's right of publicity action requires that the defendant's use be "commercial" in nature. App'x at 596. Some courts have held that, when a state's right of publicity claim includes such a "commercial purpose" or "commercial use" requirement, that element constitutes an extra element, beyond what is required to establish a claim of copyright infringement, so

---

[34] To the extent that Jackson's claim is based on Roberts's use of his stage name in the track list, a somewhat different analysis applies, which we discuss below. *See infra* section B.ii.c.

that it takes right of publicity claims outside the general scope of copyright, which does not require a commercial purpose as an element of a claim of infringement. *See Toney*, 406 F.3d at 910 (holding Illinois right of publicity claim not preempted after finding that the state law requires a showing of the defendant's "commercial purpose").

That argument is inapplicable here for a number of reasons. First, there is no substantial support for the assertion that commercial purpose is a necessary element of a Connecticut right of publicity claim. While the Connecticut Supreme Court has never specified the elements of a right of publicity claim, lower courts have assumed that the elements mirror those described in the Restatement (Second) of Torts § 652C. *See Amie Morse v. Conn. Cmty. for Addiction Recovery, Inc.*, No. CV095005371S, 2010 WL 4074949, at *26–27 (Conn. Super. Ct. Sept. 15, 2010) (applying the Restatement's definition of the misappropriation of likeness tort).[35] Under the Restatement's definition, a plaintiff may prevail on a right of publicity claim "even though the

_____

[35] *See also Grossman v. Comput. Curriculum Corp.*, 131 F. Supp. 2d 299, 311 (D. Conn. 2000) (noting that Connecticut courts have "adopted the Restatement (Second) of Torts formulation of [the right of publicity] action" (citing *Goodrich*, 448 A.2d at 1329).

[defendant's] use is not a commercial one, and even though the benefit sought

to be obtained is not a pecuniary one." Restatement (Second) of Torts § 652C

cmt. b. We see no reason furthermore why the right of publicity should be so

limited. It seems altogether appropriate that the right of publicity should

apply where the defendant has sought advantage by claiming gratuitously

that the plaintiff supports a political candidate who favors some

noncommercial cause.

Even if a commercial purpose is a necessary element of a Connecticut

right of publicity claim, this does not necessarily take the right of publicity

outside of equivalency with the "rights within the general scope of

copyright." As noted above, the focus of the "equivalency" analysis is on

whether the "nature" of a state law action "is qualitatively different from a

copyright infringement claim." *Altai*, 982 F.2d at 716 (internal quotation

marks omitted). Reliance on commercial purpose for this distinction faces the

problem that, while it is true that a commercial motivation is not essential to a

copyright or a claim of infringement of copyright, commercial interests have

always played an enormous role in copyright law. The first statute

establishing a right in authors to control copies of their works, the Statute of

59

Anne, proclaimed that its purpose was to enable authors to earn money from their writings, so as to induce them to produce "useful books." *See Golan v. Holder,* 565 U.S. 302, 347 (2012) (Breyer, J., dissenting) (explaining that the Statute of Anne "granted authors [exclusive rights] *in order to encourage them 'to compose and write useful Books'*" (quoting Statute of Anne 1710, 8 Ann. c. 19 (Eng.))). The justifying theory of copyright, as expressed in the U.S. Constitution, is that it "Promote[s] the Progress of Science" by giving authors a financial incentive to produce and disseminate works of authorship. *See Harper & Row*, 471 U.S. at 558 ("[T]he Framers intended copyright . . . [to] suppl[y] the economic incentive to create and disseminate ideas."); *Mazer*, 347 U.S. at 219 ("The economic philosophy behind the [Copyright] clause . . . is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors . . . ."). Indeed, the vast majority of activities that could constitute infringement of copyright are undertaken for a "commercial purpose," as the incentive to infringe is frequently to profit from the dissemination of material that is protected by copyright. *Cf. Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994) (rejecting the argument that "commerciality carrie[s] presumptive force

against a finding of [fair use]," noting that most activities that could constitute

fair use "are generally conducted for profit in this country"); *see also id.*

(quoting 3 BOSWELL'S LIFE OF JOHNSON 19 (G. Hill ed. 1934) ("[N]o man but a

blockhead ever wrote, except for money."))); Pierre N. Leval, *Fair Use Rescued*,

44 UCLA L. REV. 1449, 1456 (1997) ("Most undertakings in which we expect to

find well-justified instances of fair use are commercial. These include, of

course, journalism, commentary, criticism, parody, biography, and history;

even the publication of scholarly analysis is often commercial.").

  For some courts, notwithstanding the sometimes-cited proposition that

the presence of "extra elements" in the state law claim will destroy

equivalency, a requirement of "commercial use" in a right of publicity claim

is "not enough to qualitatively distinguish [a] right of publicity claim from a

claim in copyright," particularly when the essence of the plaintiff's claim is an

unauthorized reproduction of the copyrighted work. *Laws*, 448 F.3d at 1144–

45. In *Laws*, the Ninth Circuit observed that, in order to take the state law

claim out of equivalency, the "extra element" must "change the underlying

nature of the action," and that the "commercial use" requirement in

California's statutory right of publicity failed to meet this standard. *Id.* The

court observed, "Although the elements of [the] state law claim[] may not be identical to the elements in a copyright action, the underlying nature of [the] state law claim[] is part and parcel of a copyright claim." *Id.* at 1144.

Further, Second Circuit precedent establishes that a "commercial purposes" element does not sufficiently "change[] the nature of [a similar state law claim] so that it is qualitatively different from a copyright infringement claim." *Altai*, 982 F.2d at 716 (internal quotation marks and emphasis omitted); *see Motorola*, 105 F.3d at 851 (holding that the tort of commercial misappropriation under New York law, to the extent that it applies to the protection of "property rights of commercial value" from "any form of commercial immorality," falls within the general scope of copyright notwithstanding the state law requirement that the rights at issue have "commercial value" and are used "commercial[ly]"); *see also* 1 NIMMER ON COPYRIGHT § 1.14[C], LexisNexis (database updated Apr. 2020) ("It is [] irrelevant [to the equivalence requirement] that certain [*e.g.*, non-commercial] reproductions, performances, distributions, or displays . . . would infringe under the Copyright Act and not under the state-created right.").

Accordingly, whether or not Connecticut courts would impose a "commercial use" requirement for right of publicity claims, Jackson's claim is "virtually synonymous [with a claim for] wrongful copying" and is "in no meaningful fashion distinguishable from infringement of a copyright." *Motorola*, 105 F.3d at 851. As explained in the preceding section on implied preemption, Jackson's claim is a thinly disguised effort to attack Roberts's use of Jackson's song.

Accordingly, we conclude that, to the extent that Jackson's right of publicity claim is based on the reproduction of a copyrighted work ("In Da Club") embodying Jackson's voice, that claim is preempted by § 301 because (1) its focus is Roberts's use of a work that falls within the "subject matter of copyright" and (2) it asserts rights that are sufficiently equivalent to the rights protected by federal copyright law.

### c. *Jackson's Stage Name*

To the extent that Jackson's right of publicity claim is based on Roberts's use of his stage name, Jackson argues that statutory preemption can play no role because stage names are not "works of authorship" that "come within the subject matter of copyright." Br. for Appellant at 31; COMPENDIUM

§ 313.4(C) ("Words and short phrases, such as names, titles, and slogans, are not copyrightable because they contain a de minimis amount of authorship.").[36] We need not address this contention because, in any event, Jackson's claim with respect to the use of his stage name in the track list is barred by implied preemption. This aspect of Jackson's claim centers on Roberts's use of his stage name to accurately name Jackson as the performer of one of the copyrighted works that Roberts sampled in his remix, just as he used the stage names of 17 other artists to identify them in connection with the sample of their works. Even assuming that the use of an artist's name, for the sole purpose of identifying his association with a work that is reproduced, could support a Connecticut right of publicity claim, Jackson's claim would

---

[36] In other similar cases, courts have assumed, without discussion, that a right of publicity claim that is preempted because it seeks to assert the right to control the use of a copyrighted work is also preempted to the extent that the claim is based on the use of the plaintiff's name. *See, e.g., Laws,* 294 F. Supp. 2d 1160, 1161 (C.D. Cal. 2003) (noting that the defendant had mentioned the plaintiff, Debra Laws, by name, including in the packaging of its challenged musical work a credit stating that the work "[f]eatur[es] samples from the Debra Laws recording 'Very Special'"); *Laws,* 448 F.3d at 1143 (holding that the plaintiff's claim satisfied the first prong of Section 301 preemption without discussion of whether a name falls within the "subject matter of copyright"); *Ray,* 783 F.3d at 1142–44 (holding that the wrestling films the defendant had used were within the "subject matter of copyright" without discussion of the defendant's use of the plaintiff's name).

impermissibly interfere with the administration of the federal copyright system by placing a substantial barrier between copyright holders and the full exploitation of their works. The "exclusive rights to do and to authorize" the reproduction, adaptation, distribution, performance, and display of a copyrighted work would be substantially encumbered if the rightsholder or their licensees were precluded from identifying for the intended audience the authors or performers of that work.[37] To be sure, a different right of publicity claim based on the use of a name in a misleading manner may invoke a significant state interest in protecting against unauthorized exploitations of a person's name so that it would escape implied preemption. *Compare Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 638 (9th Cir. 1982) (holding that a magazine that purchased from an independent journalist an interview with Cher and published it was "entitled to inform its readers that the issue contained an article about Cher [and] that the article was based on an interview with Cher

---

[37] A state right of publicity prohibiting the use of an author or performer's name to accurately describe a work could further interfere with permitted uses of that work by individuals *other than* the rightsholder or licensee — such as an art critic, teacher, news reporter or parodist, exercising the right to make fair use of a copyrighted work. *Cf.* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright."); *see also supra* at 27 (making a similar point).

herself"), *with id.* at 638–40 (holding that a different magazine that published the same interview had violated Cher's right of publicity because its marketing copy implied Cher's endorsement of the magazine). But as discussed above, Roberts's use of Jackson's name was neither misleading nor did it imply that Jackson had endorsed Roberts, his mixtape, or his commercial album. Accordingly, because Jackson's right of publicity claim seeks to control the use of a copyrighted work by prohibiting accurate descriptions of that work, that claim impermissibly interferes with the federal copyright framework and must be dismissed.

## C. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Jackson's right of publicity claim.